ANDERSON, J.,
delivered the opinion of the court.
This case has been most elaborately argued, and at great length, especially by the learned counsel for the plaintiff in error. We deem it unnecessary to a right decision of the cause to follow the counsel through the learning they have evolved in the investigation of many of the questions they have raised.
The enquiry which is first suggested is. by what statute, or statutes, is the case governed? By the provisions of the statute, Code of 1873, ch. 86, p. 757, found in acts of Assembly of 1870-71, ch. 227, or by the act approved March 29, 1877, entitled “an act to establish a department of agriculture, mining and manufacturing in the state”? (Acts of assembly for 1876-77, p. 240). Does the latter act repeal the former, or are both in force? This is determined by the last section of the latter act, which declares “that all acts or parts of acts in conflict with this act are hereby repealed.” Any provision in the former statute, consequently, which is in conflict with this act is repealed; otherwise not. Tt is not perceivable how the latter act can be a substitute for the former, unless it repeals it.
Section 48 of the act of 1871, declares that all commercial manures and fertilizers “brought into or manufactured in the state of Virginia for sale, or sold, or kept for sale therein, shall have permanently affixed to everv sack, bag (&c.), a stamped or printed label, which shall specify, legibly, the name or names of the manufacturer or manufacturers, his, her or their place of business, the net weight of such sack, bag (&c.), the component parts of such manure or fertilizer, the percentage. by weight, which it contains of the following constituents, viz: of phosphoric acid, soluble in pure cold water; of phosphoric acid, insoluable in pure cold water; of available ammonia, potash and soda.”
Section 49 imposes a penalty of $100 for the first offence, and $200 for the second and each subsequent offence, on any person who shall sell or keep for sale any commercial manures or artificially manufactured or manipulated fertilizers not labeled in accordance with the requirements of this act, or shall affix any label not expressing truly the component parts of said manures of fertilizers, or expressing a larger percentage of the constituents, or either of them, mentioned in the 48th section, than is contained therein.
Is there anything in these sections in conflict with the act of 1877? The design of this act, as its heading shows, was “to establish a department of agriculture, mining and manufacturing in the state.”
*Section 1 authorizes and requires the governor to establish such department.
Section 2 provides that said department shall be under the control and management of one officer, who shall be known as the commissioner of agriculture; how he shall be appointed, where his office shall be, and how provided for him, and allowing him one clerk.
Section 3 fixes his salary and the salary of his clerk.
Section 4 prescribes his duties—
_First. Relative to the geological formation of the various counties of the state, and the general adaptation of the soil of said counties for the various products. And for the purpose of analyzing the soils and minerals of this state, and guanos and fertilizers, as he may deem of importance, provides for his being furnished with a sufficient chemical apparatus to use in connection with his office; and further provides for his giving information upon the above subjects, and others of interest, to those who till the soil of this state.
Second. The commissioner to have charge of the analysis of fertilizers sold to be used for agricultural purposes in this state; requiring a fair sample of every brand thereof to be first submitted to said commissioner; makes it his duty thoroughly to test the same, and if he finds the same of no practical use, after he shall have summoned the parties interested before him, and given them every opportunity to be heard in defence, the sale of the same for use in this state as a fertilizer is prohibited; and a fine of not less than $100 nor more than $1,000 is imposed _ on any person who shall' violate the provisions of this act by selling auy fertilizer to be used in this state, without first submitting a fair sample of the same to said commissioner. And agricultural lime and certain other articles named are excepted from the operation of this act. And the analysis made by the commissioner is to be made without charge.
Various other duties, of an interesting and highly important *character, are assigned to the commissioner in the subsequent clauses of this section; but neither they nor the subsequent sections of the act have any bearing upon the subject of the *200 act of 1871, or the question now under consideration.
The act of 1871 requires that the. manufacturer or manipulator of the fertilizer shall label the bag or package containing it, before he sells the same in this state, and imposes a penalty on him for omitting it, or for false representations in the label as to the quantity or quality of the fertilizer contained in the bag or package. The act of 1877 requires him, before he sells, to furnish the superintendent of agriculture, under the penalty of a fine from $100 to $1,000, with a fair sample of the fertilizer which he has for sale in this state, who is required to analyze it carefully, and to determine whether it is of any practical value or not. And if he determines that it is of no practical value, after the parties interested have been summoned before him, and have had full and sufficient opportunity to contest it, the sale of it is prohibited as a fertilizer for use in this state.
These two clauses are not in conflict. The fertilizer may not conform in quantity and quality with the labels thereon, and yet may be of some practical value; so that the sale will not be prohibited under the act of 1877, which does not in such case afford protection to the purchaser. But he has remedy under the 50th section of the act of 1871 aforesaid, which is not taken away by the act of 1877; not being in conflict with it. There is nothing in the former act which prohibits the sale of the article if it has been labeled 'as required by the act, even if it should be of no practical value; and the purchaser’s remedy is under section 50 of that act. The two acts are not in conflict; but the act of 1877 imposes additional duties on the manufacturer or seller, and and provides additional securities for the purchaser; and the two acts should be, considered together in pari materia..
*The court is of opinion that § 48, and those following on this subject, of ch. 86 of the Code of 1873, taken from the act of March, 1871, were not repealed by the act aforesaid of 1877, and were in force, and required thé plaintiff in error to affix to each bag containing the fertilizer it sold to the makers of the negotiable notes in controversy a label, in conformity with the requirements of section 48.
The plaintiff’s action is debt, and the plea is nil debet. The facts are agreed. And under the plea of nil debet, it was agreed that the defendant should have the benefit of all the facts agreed, as fully and effectually as he could under any special pleas which he could file in the cause. &c.
It seems that the defendant did not rely upon any defects in the fertilizer which the plaintiff sold to the makers of the notes, or upon the ground that the makers, or either of them, were injured or defrauded by the contents of the bags not conforming in quality or quantity to the labels thereon, or that there -was any failure of consideration; but solely upon the ground that the labels were not in conformity with the requirements of the statute, and that the sales to them were _ consequently illegal and void, and the plaintiff was not entitled to the aid of the court' in the enforcement of on illegal contract.
The first enquiry, then, is, were the bags containing the fertilizer labeled in conformity with the requirements of the statute?
The defendant contends that the label affixed to the bags does not specify the component parts of the fertilizer they contain, as required by the statute; and upon that ground alone contends that the sale of it in Virginia was prohibited and illegal. According to the statement of agreed facts, the plaintiffs became the purchasers of the formula for making the fertilizer in question, and the right to use the brand of “Eureka” thereon, in July, 1873, and then commenced its manufacture — and used the same materials *and the same formula, and adopted the same process, that had been used and adopted by those who preceded them in its manufacture from the year 1865 down to that time, and under the supervision of the same person who originated the said fertilizer, and who has continued to supervise the manufacture of the same for the plaintiffs. And they stamped on each bag the following label: “Eureka. 200 lbs. Ammoniated Bone Superphosphate of Lime. Manufactured by Atlantic & Virginia Fertilizing Co. Orient, L. I.” And these words, they contend, express the component parts of the fertilizer, as required by the Virginia statute. They are not words in common or popular use, but are technical words used by chemists, and have a certain and exact meaning; and the question is, do they express what are the component parts of the said fertilizer? This is a question which chemists alone can satisfactorily answer.
We have the statements of Dr. Pollard, commissioner of agriculture for the state of Virginia, and Dr. William H. Taylor, state chemist, as experts, which, by the agreement of the parties, are to be taken as facts proved in the cause. Dr. Pollard states, as an expert, that the words “ammoniated bone superphosphate of lime,” on the said label, do sufficiently express the component parts of said fertilizer, and gives his reasons for that opinion. He further states, as an expert, and as commissioner of agriculture, that in his opinion said label does comply with the requirements of ch. 86, § 48 of the Code of 1873; and from the nature and character of what is required, could not well be done in any other way or manner; and is the mode usually adopted by all manufacturers of such fertilizers, since the passage of the act requiring them to have stamped labels on the bags. Dr. Taylor, the regularly appointed state chemist, entirely concurs with Dr. Pollard in all his statements and opinions, and as an expert fully endorses them. What better evidence could we have of the meaning of the *words of art put upon these labels, and that they express the component parts of the fertilizer — at least what the manufacturers claimed for it? Indeed, there is not a particle of evidence in the *201 record in conflict with it. And we cannot resist the conclusion that the terms “ammoniated bone superphosphate of lime,” legibly-stamped or labeled on the bags containing the fertilizer, are a specification of its component parts. It is true that it is expressed in words which are not in common or popular use, but in technical terms, which would not convey to the mind of an uneducated farmer, who was not a chemist, what were the component parts. But the statute does not require that it shall be specified in words which are in common or popular use. It only requires that the stamped or printed label shall specify legibly the component parts. It does not say that it shall be specified in terms which may be understood by an unlettered man what are the component parts. It only requires that it shall be legibly specified on the label what are the component parts that is in such manure, that it may be read. And the statute being highly penal, must be construed strictly. The idea may be expressed in technical terms with more certainty and exactness, than when expressed in words in common and popular use. And if the purchaser does not understand the words of art, he may be readily informed by enquiring of the commissioner of agriculture, or of any good chemist, what they import. If it were expressed in the plainest terms, and in the most legible characters, it would not be understood by the man who could not read. But the statute does not require that it shall be expressed in words in common or popular use, and not in words of art.
It is expressed, the commissioner of agriculture says, in the mode usually adopted by all manufacturers, and in the mode which received his approval as commissioner of agriculture, and which he, in that capacity, having charge of the analysis of fertilizers sold to be used in this state for ^agricultural purposes, decided to be in conformity with the requirements of the statute; and now to hold that the purchasers of the plaintiffs’ fertilizer, who have had the use of it, were released from the price which they agreed to pay for it, not for any defect in it, but on the ground that the label, contrary to the decision of the commissioner of agriculture, and contrary to the opinion of competent experts, did not exactly meet the requirements of the statute, would be an injustice to the plaintiffs of which they would have cause to complain.
The only impeachment of the label is the alleged nonspecification of the component parts of the fertilizer. No fault, as we understand, is ascribed to it in other respects; and we think there is not the slightest ground for it; but that in all other respects it fully meets the requirements of the statute. And we are of opinion upon the agreed facts, and the best, and in fact, the only evidence in the record, that, in the point where it is assailed it is groundlessly assailed, and that in that respect also it conforms to the requirements of the statute. It is therefore unnecessary to consider the question, which has been so elaborately and ably argued by the learned counsel, whether the contracts in question, if prohibited, were illegal, and if illegal, could be enforced. We are of opinion for the reasons given, and upon the grounds stated, that the judgment of the court below is erroneous and must be reversed.
The judgment was as follows:
The court is of opinion, for reasons stated in writing and filed with the record, that the bags which contained the fertilizer sold by the plaintiffs to the makers of the negotiable notes, which was the consideration thereof, were labeled substantially in conformity with the requirements of the statute, and that the contracts of sale which were the foundation of said notes consequently were not illegal and *void; and that the judgment of the court below was erroneous. It is therefore considered, that the said judgment be reversed and annulled, and that the plaintiffs in error recover their costs expended in the prosecution of their writ of error here. And this court, proceeding to render such judgment as ought to have been rendered by the court below, it is considered that the plaintiffs recover of the defendant the sum of $ü(¡7, with interest at the rate of 6 per centum per annum, &c., on $487, part thereof, from the 4th day of October, 1878; and on $35, another part thereof, from October 13, 1878; and on $10, another part thereof, from October 21, 1878; on $50. another part thereof, from October 27, 1878; and on $25, the residue thereof, from October 29, 1878, till payment, and their costs expended in the prosecution of their suit in the court below.
Judgment reversed.